IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BARBER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JESSE D. BARBER, APPELLANT.

Filed May 16, 2023.    No. A-22-621.

Appeal from the District Court for Dawes County: TRAVIS P. O'GORMAN, Judge. Affirmed.

Mark E. Rappl, of Naylor & Rappl Law Office, for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and MOORE and ARTERBURN, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Jesse D. Barber appeals from the district court for Dawes County, which denied his motion for postconviction relief. For the reasons that follow, we affirm.

## II. BACKGROUND

### 1. TRIAL AND CONVICTION

In 2017, Barber was tried and convicted by a jury on charges that he committed first degree sexual assault on or about June 29, 2013. See *State v. Barber*, 28 Neb. App. 820, 948 N.W.2d 306 (2020). On that night, 17-year-old A.N., was drinking alcohol at a party near Barber's home in Chadron, Nebraska. At some point, A.N. vomited in the bathroom at the party and decided she wanted to leave. A.N. was afraid to go home to her father's house in Chadron because she thought he would be angry. A.N.'s mother suggested that A.N. spend the night at Barber's house, as Barber, 27 years old at the time, and A.N.'s mother were dating at the time.

- 1 -

A.N. made her way to Barber's house on foot when a bystander in a nearby home heard "someone shuffling their feet . . . almost like they were hopping on one leg." The bystander testified as follows:

I walked out on the front porch, and saw [A.N.] walking . . . [a]nd the reason it was making the funny sound was she would take so many steps and then she'd lose her sandal . . . one of her flip-flops would go flying off in front of her. And she would get up to it, try to get it back on, get it back on, take a few more steps, same thing would happen. . . . When she tried to adjust [her sandal] with her feet a couple times, she'd have difficulty and she'd have to reach down and do it and she'd, you know, almost lose balance a little bit but get it back on.

Out of concern, the bystander approached A.N. and noticed a "[h]eavy smell of alcohol." A.N. explained that she was going to Barber's house, and that her mother had given her permission to stay there. The bystander testified that "due to her balance and talking to me just the way she tried to structure sentences and stuff, I decided to walk with her . . . because if she ended up on the ground, she would probably be passed out where she was." After A.N. entered Barber's house, the bystander decided to call law enforcement because he thought the situation had the potential to go bad, explaining, "as intoxicated as she was, I didn't know if she really talked to her mother."

Law enforcement officers Aron Chrisman and Marissa Toof responded to Barber's home and confirmed that A.N.'s mother had approved of her staying there. Barber acknowledged that A.N. was drunk, and Chrisman also determined that A.N. was drunk due to her "slurred speech." A.N. was fully clothed at the time, and she was lying on the bed in the bedroom. The officers left Barber's home after about "2 or 3 minutes," and there was no further investigation at the time.

According to Barber's version of events, A.N. fell asleep on the bed, and he initially decided to sleep on the couch. However, Barber indicated he could not get comfortable, so he "went to [the] bed and slept on the edge." Barber testified that he fell asleep immediately but was "woken up to [A.N.] making noise," at which point Barber "rolled over and [A.N.] was naked in my bed . . . [and] she proceeded to come at me." Barber testified that A.N. initiated oral sex, and Barber "return[ed] the favor," after which the two engaged in sexual intercourse "in a missionary style."

A.N. testified that she did not remember any of this. A.N. recalled waking up fully clothed, and she noticed blood on the bedding. A.N. asked Barber about the blood on the bedding, and he responded, "'Don't you remember last night? Last night was crazy.'" Barber explained to A.N. that they had sex, but A.N. did not believe him until he showed her naked pictures of herself that Barber had taken on his cell phone. Barber testified that he was "not trying to hide it from [A.N.]," as his perspective was that A.N. "instigated this whole thing . . . I didn't do anything legally wrong."

According to Barber, A.N. gave no indication that she was too intoxicated to provide consent. Rather, Barber testified that he "thought [A.N.] consented," as she was "the one who started it and she did it to me." When asked why she waited so long to report the incident (approximately 4 years), A.N. testified as follows: "A lot of reasons. [Barber] was in a relationship with my mom at the time . . . I didn't want to hurt her. I didn't want her to blame me. I had a serious boyfriend at the time. And I didn't remember what happened. I was scared, ashamed."

In closing argument, the State emphasized the "overwhelming" evidence that "[A.N.] was highly intoxicated . . . [and Barber] knew or should have known her state." The defense, on the other hand, argued that A.N. demonstrated the capacity to consent, her apparent intoxication notwithstanding. The jury returned a guilty verdict, and Barber filed a direct appeal to this court.

## 2. DIRECT APPEAL

On direct appeal, Barber challenged the sufficiency of the evidence against him and assigned that the district court committed plain error in instructing the jury. Barber also raised several ineffective assistance of trial counsel claims. This court concluded that the district court committed plain, albeit harmless, error when it combined the definitions of "without consent" and "incapable of resisting" into a single jury instruction. Barber's position was that "the State's entire case was based on the theory that he committed first degree sexual assault by subjecting A.N. to sexual penetration when Barber knew or should have known that A.N. was mentally or physically incapable of resisting or appraising the nature of her conduct." *State v. Barber*, 28 Neb. App. 820, 831, 948 N.W.2d 306, 316 (2020). As such:

> [B]ecause the State did not present any evidence that he compelled A.N. to submit due to threat of force or coercion, any evidence that A.N. expressed a lack of consent through words or conduct, or any evidence that he used deception to obtain consent, the court erred in instructing the jury on the alternative sexual assault theory of "without consent."

*Id.* We agreed. Nevertheless, we concluded that this constituted harmless error because:

> [I]t was clear the State's theory was incapacity to consent, not that she did not consent. . . .
> [T]he instructions, when taken as a whole, combined with the evidence and arguments presented at trial, clarified any ambiguity such that the jury understood the parties' use of the phrase "without consent" to include the incapacity to consent.

*Id.* at 833-34, 948 N.W.2d at 318. We ultimately affirmed Barber's conviction, finding the evidence against him sufficient. With respect to Barber's ineffective assistance of counsel claims, one of them was affirmatively refuted by the record, and the remaining claims were preserved for postconviction review. The Nebraska Supreme Court denied Barber's subsequent petition for further review.

## 3. POSTCONVICTION

Barber filed a verified motion for postconviction relief, alleging ineffective assistance of trial counsel in many respects. Barber first alleged ineffective assistance prior to trial in that trial counsel "failed to conduct an adequate investigation, failed to gather defense evidence, and failed to summon material defense witnesses." In that regard, Barber argued as follows:

> Given the lack of any corroborative evidence to support A.N.'s belated sexual assault allegation, the present case hinged almost exclusively on the credibility of A.N. As such, it was imperative for trial counsel to obtain evidence which would have impeached

A.N.'s credibility, and as noted below, a plethora of such impeachment evidence did exist but affiant's trial counsel inexplicable [sic] failed to obtain it.

Barber then identified three named individuals that trial counsel failed to "contact, interview, or depose" and a variety of evidence that trial counsel failed to obtain, such as cell phone records from the night of the assault and forensic testing of Barber's bedding.

Barber next alleged ineffective assistance during trial in that trial counsel failed "to call key witnesses . . . properly impeach A.N. and other witnesses . . . [and] neglected to present vast amounts of evidence which would have properly advanced [Barber's] theory of the case and would have significantly undermined the veracity of A.N.'s allegations against [Barber]." Specifically, Barber argued that trial counsel was ineffective for (1) "suggest[ing] to the jury" during voir dire that none of the witnesses, including A.N., would be lying, (2) failing to present the testimony of five named individuals, and (3) failing to properly impeach A.N. and three other witnesses at trial.

The district court dispensed with three of Barber's claims without an evidentiary hearing and granted an evidentiary hearing on the remaining claims. The court rejected Barber's claims that trial counsel was ineffective for failing to properly impeach A.N. and three other witnesses, as the record reflected that those witnesses were cross-examined. The court further rejected Barber's claim that trial counsel was ineffective for failing to produce the naked pictures of A.N., as Barber "admitted to taking the photographs." Barber does not challenge the district court's handling of those three claims on appeal.

With regard to the remaining claims, the district court concluded "it must grant an evidentiary hearing" out of "an abundance of caution" because this court had previously found the record insufficient to resolve those claims on direct appeal. The court thus granted an evidentiary hearing on Barber's claims that trial counsel was ineffective for failing to locate and depose witnesses, and failed to obtain cell phone records and forensic testing of the bedding, "[i]neffective assistance during voir dire," and failed to call additional witnesses.

Barber was the only witness to testify at the evidentiary hearing, and seven depositions were admitted into evidence. The deponents included trial counsel, A.N., and four additional individuals, some of whom will be discussed below. The district court ultimately denied Barber's motion for postconviction relief. In its order denying relief, the court noted "[t]here is no dispute that [Barber] and A.N. had a sexual encounter between June 28-29, 2013." The court observed that Barber admitted as much at trial, adding that Barber also admitted A.N. did not recall the encounter until Barber showed her the photographs he took on his cell phone. Finally, the court observed that there was ample evidence in the record to establish that A.N. was so intoxicated as to render her incapable of resisting or appraising the nature of her conduct and that Barber knew or should have known of such incapacity.

Turning to Barber's specific ineffective assistance of trial counsel claims, the court first concluded that trial counsel was not ineffective for failing to present cell phone evidence during trial. In that regard, the court observed that "[t]he issue at trial was not whether A.N. and [Barber] communicated in the past but whether A.N. [sic] condition at the time" was such as to render her incapable of resisting or appraising the nature of her conduct. As such, the court concluded that prior cell phone records would not have aided in Barber's defense.

The court further concluded that trial counsel was not ineffective for failing to present evidence on interactions between A.N. and Barber in the weeks and months after the assault. Again, the court observed that "[t]he critical interaction between [Barber] and A.N. was June 28-29, 2013. What occurred before and after had little to no bearing on the issue the jury had to decide. None of the evidence proffered by [Barber] would have affected the outcome of the case." The court similarly disposed of Barber's claims that trial counsel was ineffective for failing to interview and investigate numerous witnesses. In each case, the court noted that it had reviewed the respective depositions or law enforcement interviews and found nothing that would have aided in Barber's defense or altered the outcome of the case.

The court further concluded that trial counsel was not ineffective for failing to call witnesses at trial, nor for failing to test Barber's bedding for blood evidence. With regard to the latter, the court observed as follows:

> [Barber] claims that the bedding at issue had not been washed or laundered since the sexual assault occurred. Even if true, it is highly questionable whether or not any forensic examination of that bedding would have been admissible, and even if so, would be highly suspect of any forensic evidence. [Barber] is grasping at straws.

The court's order does not discuss Barber's ineffectiveness claim with respect to trial counsel's comments during voir dire, and Barber does not raise that claim on appeal. The district court ultimately denied Barber's motion for postconviction relief, and Barber appealed.

## III. ASSIGNMENT OF ERROR

Barber assigns that the district court erred in denying his motion for postconviction relief.

## IV. STANDARD OF REVIEW

In an evidentiary hearing on a motion for postconviction relief, the trial judge, as the trier of fact, resolves conflicts in the evidence and questions of fact. *State v. Newman*, 310 Neb. 463, 966 N.W.2d 860 (2021). An appellate court upholds the trial court's findings unless they are clearly erroneous. *Id.*

Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. *Id.* When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *Id.* With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Newman, supra.*

## V. ANALYSIS

Postconviction relief is a very narrow category of relief, available only to remedy prejudicial constitutional violations that render the judgment void or voidable. *Id.* The Nebraska Postconviction Act is intended to provide relief in those cases where a miscarriage of justice may have occurred; it is not intended to be a procedure to secure a routine review for any defendant dissatisfied with his or her sentence. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Newman, supra.* To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law in the area. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Newman, supra.*

On appeal, Barber raises 10 distinct claims of ineffective assistance of trial counsel which were rejected by the district court, and we consolidate them into the following six separate claims: (1) failure to present cell phone evidence, (2) failure to present evidence of post-assault interactions with A.N., (3) failure to interview and investigate potential witnesses, (4) failure to call material witnesses at trial, (5) failure to test Barber's bedding for blood evidence, and (6) failure to present A.N.'s motive to fabricate the assault allegation.

The State argues that the sixth claim is not properly before this court because Barber was represented by new counsel on direct appeal, and he failed to raise that claim at that time. See *State v. Warner*, 312 Neb. 116, 977 N.W.2d 904 (2022) (when represented by new counsel, issues of trial counsel's ineffective performance procedurally barred if not raised on direct appeal). Furthermore, this claim was not raised in Barber's motion for postconviction relief or otherwise presented to the district court. See *State v. Sellers*, 290 Neb. 18, 858 N.W.2d 577 (2015) (appellate court will not consider postconviction claim not presented to district court). We agree with the State that Barber's sixth claim identified above is not properly before this court, and we decline to address it.

The bulk of Barber's remaining arguments revolve around trial counsel's failure to adduce evidence which Barber alleges would have reflected negatively on A.N.'s credibility. Barber argues that A.N.'s credibility was "the paramount consideration for the jury," such that trial counsel's failure to resolve inconsistencies in her trial testimony was prejudicial to his defense. Brief for appellant at 13. In general, Barber's position is that, "A.N.'s credibility was paramount in this case and any impeachment evidence would have benefitted [Barber] in an appreciable way." *Id*. at 29. Barber repeatedly argues that "trial counsel's inexcusable failure to present [impeachment evidence] . . . would have undoubtedly had a profoundly different perception of A.N.'s credibility." Brief for appellant at 11-12, 16, 20, 24, 26, 28, 29, 32, 35.

Barber acknowledges that the ultimate issue for the jury was whether A.N.'s intoxication rendered her incapable of resisting or appraising the nature of her conduct. See Neb. Rev. Stat. § 28-319(1)(b) (Reissue 2016). Yet, Barber's narrow focus on A.N.'s credibility suggests that he believes A.N.'s trial testimony as to her lack of memory was the only evidence of her intoxication level. However, even if we exclude A.N.'s testimony as to her lack of memory, the record was replete with evidence, both circumstantial and direct, tending to demonstrate A.N.'s level of intoxication on the night in question.

Perhaps most importantly, Barber himself testified that A.N. had been drinking that night and was drunk when she arrived at his home. Barber recalled that A.N.'s mother called him to inform him that "[A.N.] needed a place to go because she had been drinking," and Barber can be heard on a police body camera stating that A.N. was drunk. The bystander also testified at length

regarding A.N.'s apparent intoxication, and the responding officers observed A.N. exhibiting signs of intoxication. Moreover, Barber corroborated A.N.'s account that she did not remember what happened when she woke up the next morning, as Barber testified that A.N. did not believe the sexual encounter occurred until he showed her the pictures on his phone.

Altogether, there was ample evidence for the jury to conclude that A.N. was intoxicated to a point that rendered her incapable of resisting or appraising the nature of her conduct and that Barber knew or should have known of A.N.'s incapacity. This evidence includes, but is certainly not limited to, A.N.'s testimony that she did not recall the sexual encounter on the morning after it occurred. While we address each of Barber's remaining claims below, we disagree with Barber's sweeping suggestion that A.N.'s credibility was of such paramount importance to the State's case that prejudice can be established by simply identifying "any impeachment evidence" that trial counsel failed to adduce.

### 1. FAILURE TO PRESENT CELL PHONE EVIDENCE

Barber first challenges the district court's conclusion that trial counsel's failure to obtain and present cell phone records was not prejudicial. Barber points out that A.N. told law enforcement she did not have Barber's number until the night of the assault, and he asserts that his cell phone records would have revealed that A.N. called Barber's phone at least one time 17 days prior to the assault. Barber further emphasizes that cell phone records would have confirmed that he and A.N. continued to "hang out, meet up, and communicate" after the assault. Brief for appellant at 11.

Barber asserts that the cell phone records would have established that A.N. "lied to law enforcement" about having his number, such that the jury might have been more likely to believe Barber's account "that A.N. initiated the sexual encounter and voluntarily participated in the sexual encounter." Brief for appellant at 15-16. The State counters that the cell phone records "had no bearing" on the question of A.N.'s capacity, as "[t]he only issue at trial was whether A.N. had the necessary mental capacity at the time of the sexual encounter, i.e., whether she was capable of consenting to or appraising the nature of the sexual conduct on the night in question." Brief for appellee at 14. We agree. As discussed above, there was ample evidence for the jury to conclude that A.N. was incapacitated and that Barber knew or should have known of that fact. Thus, we agree with the district court that the cell phone records would not have aided in Barber's defense, and he has failed to show prejudice.

### 2. FAILURE TO PRESENT EVIDENCE OF POST-ASSAULT INTERACTIONS WITH A.N.

Barber next challenges the district court's conclusion that trial counsel was not ineffective for failing to present evidence on post-assault interactions between Barber and A.N. The State argues that the jury was aware of an ongoing relationship between Barber and A.N., such that trial counsel was not ineffective for failing to adduce that evidence. In any case, we agree with the district court that "[t]he critical interaction" occurred on the night of the assault, and anything that occurred before or after that night had "little to no bearing on the issue the jury had to decide." Thus, Barber has failed to show prejudice.

### 3. FAILURE TO INTERVIEW AND INVESTIGATE
### POTENTIAL WITNESSES

Barber next challenges the district court's conclusions with respect to five named individuals that trial counsel failed to interview and investigate prior to trial. In rejecting each of those claims, the district court reviewed depositions and interviews of the identified witnesses and found nothing which would have aided in Barber's defense or altered the outcome of the case. While we agree generally with the district court's assessment, we address Barber's claims with respect to each witness below.

#### (a) Braxtyn Hespe

Barber alleges that Braxtyn Hespe "was a critical witness . . . because, not only was [Hespe] dating A.N. at the time of the alleged sexual assault, he also had critical information about the sexual encounter in question." Brief for appellant at 20. Specifically, Barber alleges A.N. told Hespe that she felt "guilty" about having sex with Barber and that "she may have been responsible for initiating the sexual encounter." *Id*. at 20. Barber then argues that "it would have been critical for the jury to know" this information "because [it] would have established that she was mentally and physically capable of resisting or appraising the nature of [Barber's] conduct." *Id*. at 21. We disagree.

Once again, the ultimate question for the jury was whether A.N. was so intoxicated as to be incapable of resisting or appraising the nature of her conduct, and if so, whether Barber knew or should have known of such incapacity. Even crediting Barber's assertions that A.N. initiated the sexual encounter and then felt guilty about it thereafter, such would not necessarily undermine the jury's findings as to A.N.'s capacity or Barber's knowledge thereof. That is, even if A.N.'s conduct indicated that she was consenting to the sexual encounter as Barber contends, such would not negate the jury's finding that she was nevertheless so intoxicated as to be incapable of appraising the nature of her conduct at that time. Thus, we agree with the district court that nothing in Hespe's deposition would have raised a reasonable possibility of a different outcome in this case, and Barber has failed to show prejudice.

#### (b) Tatum Westemeier

Barber alleges that Tatum Westemeier would have testified that A.N. told Westemeier, prior to leaving the party, that she was going to Barber's home and that it was not too far from the party. Barber argues:

> This was critical evidence . . . because it established that A.N. had the presence of mind to know where [Barber] lived in proximity to the party (ie: she was not too impaired to know where she was at and where she was going which would have suggested that she was she [sic] mentally and physically capable of resisting or appraising the nature of [Barber's] conduct at the time of the sexual encounter). Moreover, this evidence would have established that none of A.N.'s friends who attended the party were concerned about A.N. going to [Barber's] residence notwithstanding the fact that A.N. had been consuming alcohol on the night in question.

Brief for appellant at 21-22. Barber further alleges that Westemeier would have testified that A.N. had expressed some uncertainty about whether she initiated the sexual encounter, and that A.N. indicated she was reluctant to come forward out of fear that Hespe, who was A.N.'s boyfriend at the time, would be mad about what happened.

The State counters that the record already reflected much of Westemeier's purported testimony, and to the extent that it did not, such evidence would not have changed the outcome of this case. With respect to A.N. initiating the sexual encounter, the State argued as follows:

> A.N. never denied that it was possible she initiated or participated in the sexual encounter. She just couldn't recall anything, as established at trial, because she was intoxicated on the night in question and had no recollection of what happened when she woke up the next morning. This was the State's theory of the case, i.e., that A.N. was extremely drunk that night, to the point that she had no recollection of what happened, and Barber knew or should have known that she lacked the capacity to consent to or appraise the sexual encounter. . . . A.N. did not allege, nor did the State, that A.N. was unconscious the entire night and couldn't have participated in the sexual encounter to some extent.

Brief for appellee at 22-23. We agree. Even assuming that A.N. said or did something to initiate the sexual encounter, such would not negate the jury's finding that she was nevertheless unable to resist or appraise the nature of her conduct at the time, and that Barber knew or should have known of A.N.'s incapacity. Thus, we agree with the district court that Westemeier's purported testimony would not have raised a reasonable probability of a different outcome, and Barber has failed to show prejudice.

### (c) Ashlea Kerr and Bailea Kerr

Ashlea Kerr and Bailea Kerr were friends of A.N.'s, and they attended the same party as A.N. on the night of the assault. Barber alleges that they would have testified that A.N. stated prior to trial that she woke up in Barber's bed without any clothes on, contrary to her trial testimony that she awoke fully clothed. Barber argues as follows:

> These inconsistencies are impossible to reconcile and would have critically damaged A.N.'s credibility with the jury. If she was mistaken, or dishonest, about being clothed versus naked when she woke up in [Barber's] bed, then she could have been mistaken, or dishonest, about a number of other critical events from the date in question, including the presence of blood on [Barber's] bedding and A.N.'s overall ability to recall the sexual encounter itself.

Brief for appellant at 28. For many of the same reasons already discussed above, we agree with the district court that the purported testimony of Ashlea and Bailea would not have created a reasonable probability of a different outcome, and Barber has failed to show prejudice.

### (d) Joshua Matulka

Joshua Matulka was dating A.N. in 2017, at the time that A.N. reported the assault. Barber alleges that Matulka would have testified that A.N. told him she "stormed out" of Barber's house after waking up the morning after the assault, contrary to her trial testimony that she and Barber

ate breakfast and left the house together. We agree with the district court that "[t]his slight difference in testimony would not have made a difference at trial." Thus, Barber has failed to show prejudice.

### 4. FAILURE TO CALL WITNESSES AT TRIAL

Barber next alleges that trial counsel was ineffective for failing to call Nancy Stein and Marissa Toof to testify at trial.

### (a) Nancy Stein

Stein is A.N.'s aunt, and A.N. reported the assault to Stein sometime prior to notifying her mother and law enforcement. Barber alleges that Stein would have testified that A.N. told her the police dropped her off at Barber's house, as opposed to her trial testimony that she walked, and that A.N. told Stein and others not to tell A.N.'s mother about the assault. Barber further alleges that Stein "began to question the veracity of A.N.'s sexual assault allegations" because A.N. was reluctant to report the incident to her mother and she "was hanging out with [Barber] in a variety of social settings which did not seem rational [sic] behavior between an alleged rape victim and her rapist." Brief for appellant at 25.

Even assuming Stein would have testified as Barber alleges, we agree with the district court that it would not have altered the outcome of this case. As the district court found, it was "true and uncontested" that A.N. continued to have frequent contact with Barber following the assault. This was to be suspected, as Barber was in an ongoing relationship with A.N.'s mother. It is also not surprising that A.N. would want to keep the incident from her mother, as A.N. testified that she was afraid her mother would feel betrayed by what happened. Altogether, Stein's purported testimony would not have raised a reasonable probability of a different outcome, and Barber has failed to show prejudice.

### (b) Marissa Toof

Toof was one of two law enforcement officers that responded to Barber's residence to check on A.N. shortly after she arrived. Barber emphasizes body camera footage showing Toof peek into the bedroom where A.N. was laying on the bed and stating, "She looks good to me." Barber argues, "it would have been reasonable for the jury to question why A.N. testified that she did not remember any of the sexual encounter with [Barber] yet a certified law enforcement officer appeared to have concluded that A.N.'s [sic] was not that impaired prior to the sexual encounter." Brief for appellant at 32. However, there is no indication from the video that Toof intended to convey that A.N. was not highly intoxicated. Rather, the impression from the video was that everyone involved understood that A.N. was intoxicated, and the officers were simply making sure that A.N. had a safe place to stay the night in light of her condition. Moreover, the video of Toof's statement was admitted into evidence for the jury to review and assess, such that Toof's testimony was unnecessary. We conclude trial counsel was not ineffective for failing to call Toof to testify at trial, and even if such constituted deficient performance, Barber has failed to show prejudice.

### 5. FAILURE TO TEST BARBER'S BEDDING FOR BLOOD EVIDENCE

Finally, Barber alleges that trial counsel was ineffective for failing to test Barber's bedding for blood evidence. Barber claims that the bedding was never washed after the sexual encounter

and was placed in storage. Barber argues that if forensic testing of the bedding was negative for blood, "then the jury may have inferred that A.N.'s testimony was not credible." Brief for appellant at 33. The State counters that the bedding apparently remains in Barber's possession, such that he could have obtained forensic testing prior to the evidentiary hearing on his motion for postconviction relief. However, Barber failed to do so, and the State argues that Barber has thus failed to establish a reasonable probability that forensic testing of the bedding would have altered the outcome of trial. We agree, and Barber has thus failed to show prejudice.

## VI. CONCLUSION

For the foregoing reasons, we affirm the district court's denial of Barber's motion for postconviction relief.

AFFIRMED.